626 So.2d 664 (1993)
OPERATION RESCUE, et al., Appellant,
v.
WOMEN'S HEALTH CENTER, INC., et al., Appellees.
No. 81905.
Supreme Court of Florida.
October 28, 1993.
*665 Mathew D. Staver and Jeffery T. Kipi, Orlando, and John Tanner, Daytona Beach, for appellants.
Talbot D'Alemberte, Tallahassee, and Susan A. England, Fern Park, for appellees.
Talbot D'Alemberte, Tallahassee, amici curiae for Planned Parenthood Federation, joined by The Florida Abortion Council, The Religious Coalition for Abortion Rights, The Feminist Majority Foundation, The Nat. Coalition of Abortion Providers, The Nat. Abortion *666 Federation, and The Florida Ass'n of Women Lawyers.
Nikolas T. Nikas and Benjamin W. Bull, Tupelo, MS, amicus curiae for American Family Ass'n, Inc.
Robert A. Butterworth, Atty. Gen. and Gerald B. Curington, Asst. Atty. Gen., Tallahassee, amicus curiae for Office of the Atty. Gen.
PER CURIAM.
We have for review a trial court order imposing an amended permanent injunction. The order has been certified by the district court as passing on an issue of great public importance requiring immediate resolution by this Court. We have jurisdiction. Art. V, § 3(b)(5), Fla. Const. We approve the order.

I. FACTS
Women's Health Center (Health Center) filed suit against Operation Rescue and others (Operation Rescue) seeking an injunction prohibiting that organization from engaging in certain activities against the Aware Woman Center for Choice (Clinic) in Melbourne, its patients, and staff. The court entered an order on October 25, 1991, granting a temporary injunction that imposed a number of restrictions.[1] Pursuant to the Health Center's request for permanent relief, the court directed the parties to submit a stipulation of issues and facts, which the parties did.[2] The court subsequently granted long-term relief, entering a permanent injunction nearly a year later, on September 30, 1992, based on a number of findings of fact[3] and imposing *667 several general restrictions.[4]
Nearly six months later, after taking evidence and listening to extensive live testimony in a three-day evidentiary hearing, the trial court determined its prior restrictions had proved insufficient "to protect the health, safety and rights of women in Brevard and Seminole County, Florida, and surrounding counties seeking access to [medical and counseling] services." Accordingly, the court on April 8, 1993, amended its prior order, concluding that Operation Rescue was engaging in actions that "impede and obstruct both staff and patients from entering the clinic" based on the following findings of fact:
A. That despite the injunction of September 30, 1992, there has been interference with ingress to the petitioners' facility known as the Aware Woman Clinic located on the northwest corner of U.S. Highway One and Dixie Way in the City of Melbourne, Brevard County, Florida. The interference to ingress has taken the form of persons on the paved portions of Dixie Way, some standing without any obvious relationship to others; some moving about, again without any obvious relationship to others; some holding signs, some not; some approaching, apparently trying to communicate with the occupants of motor vehicles moving on the paved surface; some marching in a circular picket line that traversed the entrance driveways to the two parking lots of the petitioners and the short section of sidewalk joining the two parking lots and then entering the paved portion of the north lane of Dixie Way and returning in the opposite direction. Other persons would be standing, kneeling and sitting on the unpaved shoulders of the public right-of-way. As vehicular traffic approached the area it would, in response to the congestion, slow down. If the destination of such traffic was either of the two parking lots of the petitioners, such traffic slowed even more, sometimes having to momentarily hesitate or stop until persons in the driveway moved out of the way.
B. The number of people on any one day would vary from a handful to a crowd of four hundred... . The frequency with which persons would appear at this location would range from once a week to three times a week with the largest gatherings usually on Saturdays.
C. Associated with such gatherings would be noise emanating from singing, chanting, whistling, loudspeakers ... and occasional bullhorns... .
... .
E. As traffic slowed on Dixie Way and began its turn into the clinic's driveway, the vehicle would be approached by persons designated by the respondents as sidewalk counselors attempting to get the attention of the vehicles' occupants to give them anti-abortion literature and to urge them not to use the clinic's services. Such so-called sidewalk counselors were assisted in accomplishing their approach to the vehicle by the hesitation or momentary stopping *668 caused by the time needed for the picket line to open up before the vehicle could enter the parking lot.
The court noted that in addition to activities outside the Clinic, Operation Rescue had implemented a "blockade" of the Clinic's telephone system, jamming its lines with multiple simultaneous calls and making it impossible for Clinic staff to summon emergency medical aid:
2... . [R]epeated, nearly simultaneous, multiple telephone calls are made to the clinic, jamming its telephone lines. The jamming of the clinic's telephone system, makes it impossible for clinic staff to summon an ambulance to transfer any patient to the hospital should an emergency arise.
Further, Operation Rescue had approached the private residences of Clinic patients, employees, and staff, at times confronting employees' young children home alone while their parents worked:
G. On other occasions since the entry of the injunction on September 30, 1992, the respondent, Cadle, and others in concert with him approached the private residences or temporary lodging places of clinic employees. These approaches included not only direct communication with the occupants (sometimes the "home alone," minor children of the occupants), but also carrying signs, walking up and down on the sidewalk or street in front of the residence, shouting at passers-by, contacting (ringing doorbells of) neighbors, and providing literature identifying the clinic employee as a "baby killer."
H. On one occasion the respondent, Cadle, with others went to the vicinity of the motel where a staff physician was temporarily staying and demonstrated. While respondent, Cadle, remained outside just off the premises of the motel, others went upon the premises of the motel, some entering the motel lobby, yelling "child murderer" and "baby killer"... .
... .
1. That license tag numbers of the clinic's patients are recorded by the respondents or persons in concert with them and then are traced through state records to obtain the home address of such persons who are subsequently contacted by the respondents.
And finally, Operation Rescue had threatened violence against Clinic patients, employees, and staff:
F... . On one occasion the communication to a clinic staff person took the form of an attempt to invoke the wrath of God by shouting, "I pray that God strikes you dead now!"
... .
J. On another occasion the doctor was followed as he left the clinic by a person associated with the respondents who communicated his anger to the doctor by pretending to shoot him from the adjoining vehicle. As a result of the foregoing demonstrations and activities, and after a physician similarly employed was killed by an antiabortionist at a clinic in North Florida, this doctor terminated his employment with the clinic.
... .
3. That patients and staff are sometimes followed in a stalking manner when they leave the clinic, giving such persons a feeling of great apprehension.
The doctor who ultimately terminated his employment with the Clinic as the result of Operation Rescue's tactics testified at the evidentiary hearing concerning the adverse medical impact of those tactics on Clinic patients:
I... . As a result of patients having to run such a gauntlet, the patients manifested a higher level of anxiety and hypertension causing those patients to need a higher level of sedation to undergo the surgical procedures, thereby increasing the risk associated with such procedures. The doctor also testified that the noise of singing, chanting, shouting and yelling could be heard through the walls of the clinic and caused stress in the patients during surgical procedures and while recuperating in the recovery rooms. The doctor also testified that he observed some patients turn away from the crowd in the driveway to return at a later date. He testified that such delay in undergoing the procedures *669 also increased the risk associated therewith.
Based on Operation Rescue's continued "interference with ingress to the [Clinic]," the trial court amended the general prohibitions of the permanent injunction to prohibit Operation Rescue from engaging in the following specific acts:
(1) At all times on all days, from entering the premises and property of the Aware Woman Center for Choice ...
(2) At all times on all days, from blocking, impeding, inhibiting, or in any other manner obstructing or interfering with access to, ingress into and egress from any building or parking lot of the Clinic.
(3) At all times on all days, from congregating, picketing, patrolling, demonstrating or entering that portion of public right-of-way or private property within thirty-six (36) feet of the property line of the Clinic... . An exception to the 36 foot buffer zone is the area immediately adjacent to the Clinic on the east... . The respondents must remain at least five (5) feet from the Clinic's east line....
(4) During the hours of 7:30 a.m. through noon, on Mondays through Saturdays, during surgical procedures and recovery periods, from singing, chanting, whistling, shouting, yelling, use of bullhorns, auto horns, sound amplification equipment or other sounds or images observable to or within earshot of the patients inside the Clinic.
(5) At all times on all days, in an area within three-hundred (300) feet of the Clinic, from physically approaching any person seeking the services of the Clinic unless such person indicates a desire to communicate by approaching or by inquiring of the respondents... .
(6) At all times on all days, from approaching, congregating, picketing, patrolling, demonstrating or using bullhorns or other sound amplification equipment within three-hundred (300) feet of the residence of any of the petitioners' employees, staff, owners or agents, or blocking or attempting to block, barricade, or in any other manner, temporarily or otherwise, obstruct the entrances, exits or driveways of the residences of any of the petitioners' employees, staff, owners or agents. The respondents and those acting in concert with them are prohibited from inhibiting or impeding or attempting to impede, temporarily or otherwise, the free ingress or egress of persons to any street that provides the sole access to the streets on which those residences are located.
(7) At all times on all days, from physically abusing, grabbing, intimidating, harassing, touching, pushing, shoving, crowding or assaulting persons entering or leaving, working at or using services at the petitioners' Clinic or trying to gain access to, or leave, any of the homes of owners, staff or patients of the Clinic.
(8) At all times on all days, from harassing, intimidating or physically abusing, assaulting or threatening any present or former doctor, health care professional, or other staff member, employee or volunteer who assists in providing services at the petitioners' Clinic.
a. Law enforcement officers and Southern Bell Telephone Company are authorized, upon request of the Clinic owners to place a trap on the telephone lines of the Aware Woman Center in order to identify those persons engaged in a phone blockade and jamming of the Clinic's phone lines... .
Operation Rescue appealed the order granting the amended permanent injunction and the Fifth District Court of Appeal certified the trial court's order as passing on a matter of great public importance requiring immediate resolution by this Court.

II. LEGAL ISSUES
Operation Rescue challenges the propriety of only the amended permanent injunction, raising numerous issues under the United States Constitution: The amended injunction violates freedom of speech, freedom of association, equal protection, and the free exercise of religion.[5]

*670 A. Standard of Review
In order for a permanent injunction to issue in a proceeding such as this, the petitioner must initially satisfy certain technical requirements:
First, the plaintiff must demonstrate that the court's exercise of equity jurisdiction is proper. [In other words, the plaintiff must show that he or she has no adequate legal remedy; the threatened injury is real, not imagined; and no equitable defenses control.] Second, the plaintiff must actually succeed on the merits of [his or her] claims. Third, the plaintiff must show that the balance of equities tips in favor of injunctive relief.
If an injunction should issue, the court has wide discretion in fashioning an appropriate remedy. But this discretion is constrained by precautionary considerations. The injunction that issues may not be drawn to enjoin all conceivable breaches of the law; it must instead be carefully tailored to remedy only the specific harms shown. It may be no broader than is necessary to restrain the unlawful conduct. The injunction, as drafted, should constitute "the least intrusive remedy that will still be effective."
Northeast Women's Center, Inc. v. McMonagle, 665 F. Supp. 1147, 1152-53 (E.D.Pa. 1987) (citations omitted), affirmed in part, 868 F.2d 1342 (3d Cir.), cert. denied, 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989).
Where an injunction is issued and challenged, Florida's appellate courts possess express authority to review the order. Fla. R.App.P. 9.130(a)(3)(B). The scope of review, however, is limited. As a general rule, trial court orders are clothed with a presumption of correctness and will remain undisturbed unless the petitioning party can show reversible error. Applegate v. Barnett Bank, 377 So.2d 1150 (Fla. 1979). To the extent it rests on factual matters, an order imposing a permanent injunction lies within the sound discretion of the trial court and will be affirmed absent a showing of abuse of discretion. See, e.g., Bailey v. Christo, 453 So.2d 1134 (Fla. 1st DCA 1984), review denied, 461 So.2d 113 (Fla. 1985). This is particularly true where the order relies on live testimony or other evidence that the trial court is singularly well-suited to evaluate. Abuse of discretion, of course, is judged by the general "reasonableness" standard:
In reviewing a true discretionary act, the appellate court must fully recognize the superior vantage point of the trial judge and should apply the "reasonableness" test to determine whether the trial judge abused his discretion. If reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion. The discretionary ruling of the trial judge should be disturbed only when his decision fails to satisfy this test of reasonableness.
Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla. 1980). To the extent it rests on purely legal matters, an order imposing an injunction is subject to full, or de novo, review on appeal.
In the present case, Operation Rescue does not seriously question the technical validity of the amended injunction or the factual findings on which it is based. Our own review of the record shows that the order meets the "reasonableness" test for technical validity and that competent, substantial evidence supports the court's factual findings. Accordingly, we take as true the trial court's facts for purposes of evaluating Operation Rescue's constitutional claims.

B. Free Speech
Operation Rescue claims that the amended injunction violates the Free Speech Clause of the First Amendment of the United States Constitution because it completely bans religious speech in a traditional public forum, is not the least restrictive means of achieving the government interest, does not leave open ample alternative means of communication, and constitutes an impermissible prior restraint on free speech.
*671 The present amended injunction undeniably operates at the core of the First Amendment because it regulates picketing and other activities on an issue of public concern and courts "have traditionally subjected [such] restrictions on public issue [expression] to careful scrutiny." Frisby v. Schultz, 487 U.S. 474, 479, 108 S.Ct. 2495, 2499, 101 L.Ed.2d 420 (1988). Nonetheless, "[e]ven protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 799-800, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985).

1. Traditional public forum
To determine whether or to what extent limits may be placed on protected speech, the United States Supreme Court has generally focused on the place, or "forum," where the citizen seeks to speak. Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The federal Court has identified three types of First Amendment fora, "the traditional public forum, the public forum created by government designation, and the nonpublic forum," and has tailored an analysis for each. Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449.
The forum at issue in the present case consists of public streets, sidewalks, and rights-of-way, which  as the present parties agree  constitute a traditional public forum. See Frisby, 487 U.S. at 480, 108 S.Ct. at 2500. The relevant inquiry in such a case is multi-step and depends initially on whether the restriction is content-based or content-neutral:
In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. The State may also enforce regulations of time, place and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.
Perry, 460 U.S. at 45, 103 S.Ct. at 954-55 (quoting Hague v. Committee for Indus. Org., 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)).

2. Content-neutral
Operation Rescue claims that the time, place, and manner restrictions at issue here are content-based and thus subject to the more stringent test noted above in Perry. We disagree. The restrictions regulate when, where, and how Operation Rescue may speak, not what it may say. The restrictions make no mention whatsoever of abortion or any other political or social issue; they address only the volume, timing, location, and violent or harassing nature of Operation Rescue's expressive activity.
In fact, the injunction could apply equally to protests which supported abortion as well as to protests which opposed abortion, or indeed, to protests supporting or opposing any other cause. It is true that this injunction applies only to [these particular abortion opponents], but that is because it is only those persons who the Center has proved have created and are continuing to create a threat of violence and intimidation.
Northeast Women's Center, Inc. v. McMonagle, 939 F.2d 57, 63 (3rd Cir.1991). Because the restrictions are content-neutral, we proceed to decide whether they are "narrowly-tailored to serve a significant government interest, and leave open ample alternative *672 channels of communication." Perry, 460 U.S. at 45, 103 S.Ct. at 955.

3. Government interests
Operation Rescue claims that no significant government interest is implicated. We disagree. Numerous government interests, all of which rise to the level of "significant" or higher, are apparent. Our state has a strong interest in protecting the constitutional rights, both state and federal, express and implied, of all Florida's citizens, including its women. A woman's freedom to seek lawful medical or counseling services in connection with her pregnancy constitutes a clear personal right under both our state and federal constitutions. See Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); In re T.W., 551 So.2d 1186, 1193 (Fla. 1989). Our state also has strong interests in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks, and in protecting property rights of all Florida's citizens.
The United States Supreme Court delineated an additional government interest in Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), wherein the Court addressed the issue of picketers demonstrating outside the home of an abortion clinic doctor in violation of a city ordinance banning all residential picketing. The Court, in upholding the ordinance, noted that "the protection of residential privacy" constitutes "a significant government interest" and that "[o]ne important aspect of residential privacy is protection of the unwilling listener." Id. at 484, 108 S.Ct. at 2502.
Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different. "That we are often captives outside the sanctuary of the home and subject to objectionable speech ... does not mean we must be captives everywhere." Instead, a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.
Id. at 484-85, 108 S.Ct. at 2502 (citations omitted) (quoting Rowan v. United States Post Office Dep't, 397 U.S. 728, 738, 90 S.Ct. 1484, 1491, 25 L.Ed.2d 736 (1970)). We conclude that the reasoning underlying this government interest in residential privacy applies even more convincingly to the state interest in ensuring medical privacy. Florida citizens are entitled to both unimpeded access to licensed medical facilities and freedom from unwanted confrontations and communications when undergoing lawful medical treatment, particularly where the effect of such confrontations is to place the patient's health and safety in jeopardy.

4. Narrowly tailored
Operation Rescue contends that the restrictions are not narrowly tailored, but rather operate as a complete ban on all religious and pro-life picketing outside the Clinic and homes of Clinic workers. We disagree. In sum, the amended injunction bans Operation Rescue from entering or blocking access to the Clinic, demonstrating within five feet of Clinic property on one side of the Clinic and thirty-six feet on the other three sides, making loud noises during surgery hours, approaching Clinic patients within three hundred feet of Clinic property unless invited, demonstrating within three hundred feet of the homes of Clinic workers, or engaging in violent or threatening acts against Clinic workers or patients. The trial court found as a factual matter that each of these restrictions is necessary to counteract specific abuses Operation Rescue fomented after entry of the permanent injunction nearly six months earlier. As noted above, competent, substantial evidence supports all the trial court's factual findings, including its determination that Operation Rescue engaged in impermissible activities, and Operation Rescue does not now contend otherwise.
The type of focused picketing banned from the buffer zone around the Clinic and residences differs fundamentally from the type of generally disseminated communication that cannot be completely banned in public places, such as handbilling and solicitation. Here, the picketing is directed at particular Clinic workers and patients, not the public at large. The United States Supreme Court has noted the difference between targeted *673 and general picketing and described the invidious effect of this type of targeted picketing by those opposed to abortion:
The type of picketers [i.e., abortion opponents outside a doctor's home] banned by the [restriction] generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way. Moreover, even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy. The devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt... .
... .
The First Amendment permits the government to prohibit offensive speech as intrusive when the "captive" audience cannot avoid the objectionable speech. The target of the focused picketing banned by the [restriction] is just such a "captive." The resident is figuratively, and perhaps literally, trapped within the home, and because of the unique and subtle impact of such picketing is left with no ready means of avoiding the unwanted speech. Thus, the "evil" of targeted residential picketing, "the very presence of an unwelcome visitor at the home, is created by the medium of expression itself." Accordingly, the [restriction's] complete ban of that particular medium of expression is narrowly tailored.
Frisby, 487 U.S. at 486-88, 108 S.Ct. at 2503-04 (citations omitted). The above reasoning applies with even greater force where the object of targeted picketing is the medical patient seeking treatment, rather than the home-dweller. While targeted picketing of the home threatens the psychological well-being of the "captive" resident, targeted picketing of the hospital or clinic threatens not only the psychological but the physical well-being of the patient held "captive" by medical circumstance. This is amply demonstrated by the trial court's findings in the present case.
We note that while the trial court might perhaps have achieved its goal through use of a slightly narrower buffer zone around the Clinic and workers' residences, or perhaps by allowing a solitary picketer within the buffer zone as a symbolic gesture,[6] this Court will not sit as trier-of-fact and make incremental changes in the trial court's order, particularly where the restrictions were necessitated by clear abuse. In short, we "decline to entertain quibbling over a few feet" or over purely symbolic matters. Portland Feminist Women's Health Center v. Advocates for Life, Inc., 859 F.2d 681, 686 (9th Cir.1988). The amendments accordingly are sufficiently narrowly tailored to protect significant government interests.

5. Alternative means of communication
As its last point under the Perry standard, Operation Rescue claims that the restrictions do not leave open ample alternative means of communication. We point out, however, that Operation Rescue may at all times engage in expressive activity in the vicinity of the Clinic. In fact, Operation Rescue is entirely free to do the following at any time on any day: place an unrestricted number of picketers along the south edge of Dixie Way and both the east and west edge of U.S. 1; engage in singing, chanting, and whistling, as long as it cannot be heard inside the Clinic during the designated times; engage in "sidewalk counseling" of any Clinic patient who invites contact outside the five-foot and thirty-six-foot buffer zones; and picket in the neighborhoods of Clinic workers outside the three-hundred-foot buffer zone. Dixie Way is only twenty-one feet wide in the area of the Clinic and for all practical purposes Operation Rescue will be able to convey its message just as effectively from the south side of the road as the north. In fact, on the south side, its picketers will be in closer proximity to all eastbound traffic and will thus be better-positioned to deliver their message to those drivers and passengers. The only thing Operation Rescue will be unable to do from the south side that it could otherwise do from the north is block ingress to and egress from the Clinic. The amended injunction thus leaves open ample alternative means of communication for those who object to the Clinic's activities.

*674 6. Prior restraint
As its last point under the Free Speech Clause, Operation Rescue claims that the injunction operates as an unconstitutional prior restraint on protected speech. The doctrine of prior restraint applies to content-based restrictions on speech prior to its occurrence. See Northeast Women's Center, Inc. v. McMonagle, 939 F.2d 57 (3rd Cir.1991); Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue, 406 Mass. 701, 550 N.E.2d 1361 (1990). As explained above, however, the present injunction is content-neutral.

C. Vagueness and Overbreadth
Operation Rescue claims that the following restrictions are both unconstitutionally vague and overbroad: the ban on "sounds or images observable to or within earshot of the patients inside the Clinic," the ban on "physically approaching any person seeking the services of the Clinic" within three hundred feet of the Clinic, and the ban on demonstrating within three hundred feet of workers' residences.
The United States Supreme Court has explained the doctrine of "vagueness":
It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of those freedoms." Uncertain meanings inevitably lead citizens to "`steer far wider of the unlawful zone' .. . than if the boundaries of the forbidden areas were clearly marked."
Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222 (1972) (footnotes omitted). In sum, a government restriction is vague if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).
We conclude that the ban on "sounds or images observable to or within earshot of the patients inside the Clinic" is sufficiently specific to put Operation Rescue on notice that loud noises may not be made and signs depicting patients' names or other images may not be displayed from ladders above the Clinic fence in such a manner that they would be observable to patients within the Clinic during surgery and recovery periods. See Northeast Women's Center, Inc. v. McMonagle, 939 F.2d 57, 72 (3rd Cir.1991) (injunction containing identical ban on "sounds or images observable to or within earshot of patients inside the Center" upheld). Similarly, the restrictions concerning "physically approaching" Clinic patients and demonstrating within three hundred feet of workers' homes are constitutionally sound. Each restriction was fashioned to combat a specific abuse and each provides reasonable notice that those particular abuses will no longer be tolerated. "Condemned to the use of words, we can never expect mathematical certainty from our language. The words of the [ban] are marked by "flexibility and reasonable breadth, rather than meticulous specificity," [and] we think it is clear what the [ban] as a whole prohibits." Grayned, 408 U.S. at 110, 92 S.Ct. at 2300 (citations and footnotes omitted). "We thus are unable to disagree with the [trial] court's conclusion that the terms of the [ban] are not so indefinite that men of common intelligence must necessarily guess at its meaning and differ as to its application." Medlin v. Palmer, 874 F.2d 1085, 1091 (5th Cir.1989).
As to overbreadth, the United States Supreme Court has noted that "[a] clear and precise enactment may nevertheless be `overbroad' if in its reach it prohibits constitutionally *675 protected conduct... . The crucial question, then, is whether the [ban] sweeps within its prohibitions what may not be punished under the First ... Amendment[]." 408 U.S. at 114-15, 92 S.Ct. at 2302. Operation Rescue claims that the above restrictions are overbroad in that they ban protected activities and reach individuals and groups not responsible for disruptive conduct. We have discussed the first concern already and have concluded that the amended injunction is narrowly tailored to achieve its purpose. As to the second, we note that the injunction tracks the language of Florida Rule of Civil Procedure 1.610(c), which provides that "[e]very injunction shall ... be binding on the parties to the action, their officers, agents, servants, employees, and attorneys and on those persons in active concert or participation with them who receive actual notice of the injunction." Given this limitation on the injunction's reach, we find no danger that the ban will be unfairly enforced against persons who have no notice or knowledge of the injunction's existence. See Portland Feminist Women's Health Center v. Advocates for Life, Inc., 859 F.2d 681 (9th Cir.1988).[7]

III. CONCLUSION
Richard Grayned was convicted for participating in a demonstration in 1969 outside West Senior High School in Rockford, Illinois, protesting the school's lack of African-American programs. The city ordinance under which he was convicted forbade any "noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof." Grayned v. City of Rockford, 408 U.S. 104, 107-08, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). In a key case on First Amendment rights, the United States Supreme Court upheld the conviction and ordinance, with Justice Marshall writing for the Court:
The nature of a place, "the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable." Although a silent vigil may not unduly interfere with a public library, making a speech in the reading room almost certainly would. That same speech should be perfectly appropriate in a park. The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time.
Id. at 116, 92 S.Ct. at 2303 (citation and footnote omitted). Justice Marshall went on to note that "schools could hardly tolerate boisterous demonstrators who drown out classroom conversation, make studying impossible, block entrances, or incite children to leave the schoolhouse." Id. at 119, 92 S.Ct. at 2305. In other words, the First Amendment must yield when protected speech substantially interferes with the normal functioning of a public or private place.
This rule is particularly apt in the present case, where demonstrators' tactics have impaired the functioning not of a school but a licensed medical facility and have placed in jeopardy the health, safety, and rights of Florida women. Operation Rescue has formally stipulated that its program is "directed towards closing down abortion clinics." This philosophy and the organization's past tactics are clearly "incompatible with the normal activity of [this] particular place." Grayned, 408 U.S. at 116, 92 S.Ct. at 2303.[8]
We hold the restrictions contained in the amended permanent injunction constitutional in light of the medical services provided at the Clinic and Operation Rescue's past conduct. While the First Amendment confers on each citizen a powerful right to express oneself, it gives the picketer no boon to jeopardize the health, safety, and rights of others. No citizen has a right to insert a foot in the hospital or clinic door and insist on being heard  while purposefully blocking the door to those in genuine need of medical services. No picketer can force speech into the captive ear of the unwilling and disabled.
*676 Our holding is consistent with the vast weight of both federal and state caselaw, wherein courts have upheld virtually all the present restrictions under similar circumstances.[9]
Based on the foregoing, we approve the trial court's order imposing the amended permanent injunction. A full copy of the amended injunction is appended to this opinion.[10]
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.

APPENDIX
 In the Circuit Court of the Eighteenth
 Judicial Circuit
 In and for Seminole County, Florida
 Women's Health Center, Inc., Aware
 Woman Center for Choice, Inc.,
 et al., Petitioners,
 vs.
 Operation Rescue, Operation Rescue America,
 Operation Goliath, Ed Martin, Bruce Cadle,
 et al., Respondents.
 Case No.: 91-2811-CA-16-K

AMENDED PERMANENT INJUNCTION
THIS CAUSE came before the court for hearing on the motion of petitioners for sanctions and modification of the permanent injunction entered by this court, (The Honorable Wallace H. Hall), dated September 30, 1992, and the court having taken three days of testimony and having carefully considered the evidence and the legal arguments makes the following findings:
A. That despite the injunction of September 30, 1992, there has been interference with ingress to the petitioners' facility known as the Aware Woman Clinic located on the northwest corner of U.S. Highway One and Dixie Way in the City of Melbourne, Brevard County, Florida. The interference to ingress has taken the form of persons on the paved portions of Dixie Way, some standing without any obvious relationship to others; some moving about, again without any obvious relationship to others; some holding signs, some not; some approaching, apparently trying to communicate with the occupants of motor vehicles moving on the paved surface; some marching in a circular picket line that traversed the entrance driveways to the two parking lots of the petitioners and the short section of sidewalk joining the two parking lots and then entering the paved portion of the north lane of Dixie Way and returning in the opposite direction. (See drawing attached.) Other persons would be standing, *677 kneeling and sitting on the unpaved shoulders of the public right-of-way. As vehicular traffic approached the area it would, in response to the congestion, slow down. If the destination of such traffic was either of the two parking lots of the petitioners, such traffic slowed even more, sometimes having to momentarily hesitate or stop until persons in the driveway moved out of the way.
B. The number of people on any one day would vary from a handful to a crowd of four hundred. The composition of the crowd would include some of the named respondents in this cause; some persons who were loosely associated with the respondents' organizations, Operation Rescue and Operation Goliath; some who were present in support of the clinic (pro-choice); some law enforcement officers engaging in crowd and traffic control (from five officers on light days to as many as fifty officers on other days); and some representatives of the print and television media. The frequency with which persons would appear at this location would range from once a week to three times a week with the largest gatherings usually on Saturdays.
C. Associated with such gatherings would be noise emanating from singing, chanting, whistling, loudspeakers on the exterior of the clinic broadcasting music, individual portable radios (boom boxes), and occasional bullhorns. Individuals of the partisan groups would shout and yell at each other, frequently approaching so closely as to be in each other's face trying to out-sound the other, occasionally using boom boxes at full volume as an assist.
D. The Melbourne Police Department officers on the scene on some occasions erected temporary barricades (saw horse type) in an effort to put some distance between the partisan groups. The respondents and those aligned with them, remained primarily in the public right of way (paved and unpaved). The pro choice people would be on the edge of the clinic's lawn and parking lot (private property) but occasionally attempting to share the sidewalk with the opposition. On at least one occasion in order to give more room for people, the police barricaded the north lane of Dixie Way so that two-way vehicular traffic was confined to the single south lane.
E. As traffic slowed on Dixie Way and began its turn into the clinic's driveway, the vehicle would be approached by persons designated by the respondents as sidewalk counselors attempting to get the attention of the vehicles' occupants to give them anti-abortion literature and to urge them not to use the clinic's services. Such so-called sidewalk counselors were assisted in accomplishing their approach to the vehicle by the hesitation or momentary stopping caused by the time needed for the picket line to open up before the vehicle could enter the parking lot.
F. The clinic has fences on its west and north side, and persons would occasionally place a ladder on the outside of the fence and position themselves at an elevation above the fence and attempt to communicate by shouting at persons (staff and patients) entering the clinic. On one occasion the communication to a clinic staff person took the form of an attempt to invoke the wrath of God by shouting, "I pray that God strikes you dead now!".
G. On other occasions since the entry of the injunction on September 30, 1992, the respondent, Cadle, and others in concert with him approached the private residences or temporary lodging places of clinic employees. These approaches included not only direct communication with the occupants (sometimes the "home alone", minor children of the occupants), but also carrying signs, walking up and down on the sidewalk or street in front of the residence, shouting at passersby, contacting (ringing doorbells of) neighbors, and providing literature identifying the clinic employee as a "baby killer".
H. On one occasion the respondent, Cadle, with others went to the vicinity of the motel where a staff physician was temporarily staying and demonstrated. While respondent, Cadle, remained outside just off the premises of the motel, others went upon the premises of the motel, some entering the motel lobby, yelling "child murderer" and "baby killer". The doctor testified that as a *678 result of such activity his departure for the clinic was delayed by one-half hour.
I. The same staff physician testified that on one occasion while he was attempting to enter the parking lot of the clinic, he had to stop his vehicle and remained stopped while respondent, Cadle, and others took their time to get out of the way and while doing so were yelling and screaming at the doctor, "Baby killer"  "We don't want you here in Melbourne." This physician also testified that he witnessed the demonstrators running along side of and in front of patients' vehicles, pushing pamphlets in car windows to persons who had not indicated any interest in such literature. As a result of patients having to run such a gauntlet, the patients manifested a higher level of anxiety and hypertension causing those patients to need a higher level of sedation to undergo the surgical procedures, thereby increasing the risk associated with such procedures. The doctor also testified that the noise of singing, chanting, shouting and yelling could be heard through the walls of the clinic and caused stress in the patients during surgical procedures and while recuperating in the recovery rooms. The doctor also testified that he observed some patients turn away from the crowd in the driveway to return at a later date. He testified that such delay in undergoing the procedures also increased the risk associated therewith.
J. On another occasion the doctor was followed as he left the clinic by a person associated with the respondents who communicated his anger to the doctor by pretending to shoot him from the adjoining vehicle. As a result of the foregoing demonstrations and activities, and after a physician similarly employed was killed by an antiabortionist at a clinic in North Florida, this doctor terminated his employment with the clinic.
K. Further the testimony of witnesses shows:
1. That license tag numbers of the clinics patients are recorded by the respondents or persons in concert with them and then are traced through state records to obtain the home address of such persons who are subsequently contacted by the respondents.
2. That on occasion repeated, nearly simultaneous, multiple telephone calls are made to the clinic, jamming its telephone lines. The jamming of the clinic's telephone system, makes it impossible for clinic staff to summon an ambulance to transfer any patient to the hospital should an emergency arise.
3. That patients and staff are sometimes followed in a stalking manner when they leave the clinic, giving such persons a feeling of great apprehension.

Conclusions
A. That the actions of the respondents and those in concert with them in the street and driveway approaches to the clinic of the plaintiffs continue to impede and obstruct both staff and patients from entering the clinic. The paved surfaces of the public right-of-way must be kept open for the free flow of vehicular traffic.
B. That the noise associated with the demonstrations impermissibly interferes with the operation of the clinic and the well-being of its patients and should be limited and restrained.
C. That the actions of the respondents and those acting in concert with them directed at the residences (including the temporary motel residence) of the clinic staff is impermissible conduct and should be limited and restrained. A person's home is his last place of refuge and his right of privacy therein should be protected. A place of business, not involved in the controversy of others, should not be subjected to demonstrations that interfere with business customers.
D. That the actions of the respondents and those acting in concert with them in respect to interfering with the telephone service of the clinic is impermissible and should be restrained.
E. That the uninvited contacts, shadowing and stalking by the respondents and those acting in concert with them of the clinic staff and patients are impermissible conduct and should be restrained.
*679 F. That the rights of the respondents to demonstrate, speak and make known their views should be recognized and protected.
It is, therefore
ORDERED AND ADJUDGED that the respondents, Operation Rescue, Operation Rescue America, Operation Goliath, their officers, agents, members, employees and servants, and Ed Martin, Bruce Cadle, Pat Mahoney, Randall Terry, Judy Madsen, and Shirley Hobbs, and all persons acting in concert or participation with them, or on their behalf, with notice in any manner or by means of this order (hereinafter referred to generally as respondents) are permanently enjoined from engaging in the following:
(1) At all times on all days, from entering the premises and property of the Aware Woman Center for Choice, Inc. Clinic (hereinafter Clinic) located at the northwest corner of U.S. Highway One and Dixie Way in Melbourne, Brevard County, Florida.
(2) At all times on all days, from blocking, impeding, inhibiting, or in any other manner obstructing or interfering with access to, ingress into and egress from any building or parking lot of the Clinic.
(3) At all times on all days, from congregating, picketing, patrolling, demonstrating or entering that portion of public right-of-way or private property within thirty-six (36) feet of the property line of the Clinic. The 36 foot buffer on the south side of the Clinic is demarcated by the south edge of paved surface of Dixie Way. It is the intent of the court that the respondents may use, subject to other restrictions contained herein, the unpaved portion (the shoulder) on the south side of Dixie Way. A drawing is attached hereto showing the various areas and lines. An exception to the 36 foot buffer zone is the area immediately adjacent to the Clinic on the east, lying in the right-of-way of U.S. Highway One. This area is composed of a flat shoulder area rising up an embankment to the easterly property line of the Clinic. The respondents may enter the shoulder area of U.S. Highway One, but may not go up the embankment and must remain at least five (5) feet from the Clinic's east line. Another exception to the 36 foot buffer zone relates to the record title owners of the property to the north and west of the Clinic. The prohibition against entry into the 36 foot buffer zone does not apply to such persons and their invitees. The other prohibitions contained herein do apply, if such owners and their invitees are acting in concert with the respondents. Another exception to the 36 foot buffer zone relates to the area of the pedestrian crosswalk near the area where Dixie Way enters into U.S. Highway One. The testimony before the Court revealed that such crosswalk is not presently marked by customary white lines. It is the request of this court, in order to assist the parties in complying with this injunction, that the City of Melbourne establish a crosswalk area at the eastern end of Dixie Way in customary manner by applying painted lines on the surface of the pavement. Until such lines are applied, the respondents may use an area of the paved surface of Dixie Way as a crosswalk but must confine their use of such area to a strip of pavement eight (8) feet wide, running directly from the south edge of Dixie Way to the north edge thereof, the westerly line of such strip being coextensive with the western right-of-way line of U.S. Highway One. (See drawing attached.) After painted lines are applied, the respondents must not enter any portion of the paved surface of Dixie Way outside of the crosswalk within the 36 foot buffer zone. The respondents use of the crosswalk must be limited to the prompt crossing of the street. The crosswalk may not be used as an area of picketing, congregating or demonstrating. The respondents use of the crosswalk must not inhibit or impede the free flow of traffic on Dixie Way, and no stopping or hesitation in the crosswalk shall be allowed.
(4) During the hours of 7:30 a.m. through noon, on Mondays through Saturdays, during surgical procedures and recovery periods, from singing, chanting, whistling, shouting, yelling, use of bullhorns, auto horns, sound amplification equipment or other sounds or images observable to or within earshot of the patients inside the Clinic.
(5) At all times on all days, in an area within three-hundred (300) feet of the Clinic, *680 from physically approaching any person seeking the services of the Clinic unless such person indicates a desire to communicate by approaching or by injuring of the respondents. In the event of such invitation, the respondents may engage in communications consisting of conversation of a non-threatening nature and by the delivery of literature within the three-hundred (300) foot area but in no event within the 36 foot buffer zone. Should any individual decline such communication, otherwise known as "sidewalk counseling", that person shall have the absolute right to leave or walk away and the respondents shall not accompany such person, encircle, surround, harass, threaten or physically or verbally abuse those individuals who choose not to communicate with them.
(6) At all times on all days, from approaching, congregating, picketing, patrolling, demonstrating or using bullhorns or other sound amplification equipment within three-hundred (300) feet of the residence of any of the petitioners' employees, staff, owners or agents, or blocking or attempting to block, barricade, or in any other manner, temporarily or otherwise, obstruct the entrances, exits or driveways of the residences of any of the petitioners' employees, staff owners or agents. The respondents and those acting in concert with them are prohibited from inhibiting or impeding or attempting to impede, temporarily or otherwise, the free ingress or egress of persons to any street that provides the sole access to the street on which those residences are located.
(7) At all times on all days, from physically abusing, grabbing, intimidating, harassing, touching, pushing, shoving, crowding or assaulting persons entering or leaving, working at or using services at the petitioners' Clinic or trying to gain access to, or leave, any of the homes of owners, staff or patients of the Clinic (unless permitted by "invited contact" as defined on page 10 of this order).
(8) At all times on all days, from harassing, intimidating or physically abusing, assaulting or threatening any present or former doctor, health care professional, or other staff member, employee or volunteer who assists in providing services at the petitioners' Clinic.
(9) At all times on all days, from encouraging, inciting, or securing other persons to commit any of the prohibited acts listed herein.
ORDERED AND ADJUDGED that nothing herein shall restrict duly constituted law enforcement authorities from providing traffic control and regulation and measures necessary to insure public safety and the protection of both public and private property.
ORDERED AND ADJUDGED that any City of Melbourne police officer or other person authorized to serve process may serve a copy of this order on any individual who may not have otherwise received notice of the order. Such officer may read the operative prohibitory language of this order to any individual who is without notice of this order, and such service or oral notice shall subject the person so served or noticed to the sanctions provided for herein for failure to comply herewith. If the authorities of the City of Melbourne determine that it would assist them in enforcing this order to erect in the public right-of-way a notice that the use of the area specified herein as a buffer zone is subject to court order, they are authorized to do so. Such signs may contain the following language or words of similar import: "WARNING. Demonstrations and picketing in this area are limited by court order. Violators of this court order are subject to arrest. See Amended Permanent Injunction dated April 8, 1993, filed in Case No. 91-2811-CA-16-K, Circuit Court, 18th Judicial Circuit, Seminole County, FL. Copies of the Amended Permanent Injunction are posted at B Brevard County Branch Courthouse, 50 S. Neiman Ave., Melbourne, FL; Sarno Complex, 1515 Sarno Road, Melbourne, FL; and Melbourne City Hall, 900 E. Strawbridge Ave., Melbourne, FL."
ORDERED AND ADJUDGED that, in order to provide for the protection of the owners, staff and patients of the Clinic and to prevent the further disruption of the operation of the Clinic, the court hereby enters the following additional orders:
*681 a. Law enforcement officers and Southern Bell Telephone Company are authorized, upon request of the Clinic owners to place a trap on the telephone lines of the Aware Woman Center in order to identify those persons engaged in a phone blockade and jamming of the Clinic's phone lines;
b. Law enforcement authorities, pursuant to the protective provisions of the court's order, are authorized to arrest those persons who appear to be in willful and intentional disobedience of this injunction. Upon such arrest the person so arrested shall be admitted to bail upon the posting of a $500 cash or surety bond, which bond will be returnable before the undersigned judge at his chambers, Room N327, Seminole County Courthouse, 301 N. Park Avenue, Sanford, FL at 8:30 a.m. on the seventh (7th) day after arrest exclusive of weekends and holidays. Any county or circuit judge in Brevard County is authorized to modify, upward or downward, the dollar amount and the return date of such bond upon good cause being shown. In the event of arrest and no bond being posted, the person arrested shall be promptly transferred to the Seminole County jail and the undersigned judge shall be immediately notified by the arresting officer and Seminole County jailer of such confinement. Such arrested persons shall be brought before the undersigned judge not later than 8:30 a.m. of the day following his confinement in the Seminole County jail.
ORDERED AND ADJUDGED that at all times on all days, respondents shall have the right to congregate, demonstrate and freely express themselves outside the Clinic buffer zone subject to the noise limitations on the days of surgical procedures set out in paragraph 4 of this order and subject also to all other provisions of this order and any other restraining orders and injunctions that may have been issued by other courts.
ORDERED AND ADJUDGED that at all times on all days, respondents will have the right of invited contact with persons protected hereby so long as it is outside of the Clinic buffer zone. "Invited contact" is defined as conduct by the person sought to be contacted which affirmatively indicates a desire to engage in conversation or to receive literature. Such affirmative indication may include where the person sought to be contacted physically approaches the respondent, or where such person extends his or her hand to receive literature, or speaks words indicating a positive interest in what the respondent is saying. Such invited contact by a person protected hereby as it relates to a contact at such persons residence is limited to conduct transmitted by the resident to a respondent at a distance from and at a time prior to the contact and shall not include the uninvited ringing of a doorbell or knock on a door. Any invited contact may be canceled by such person by words spoken that indicate a desire to end the contact, such as "stop", "withdraw", "back off", "get away", "leave me alone" or other words or actions of similar import. Where such desire to end the contact is made known to a respondent, he/she must immediately terminate the contact and leave the presence of the person protected hereby.
ORDERED AND ADJUDGED that the permanent injunction of this court issued September 30, 1992, shall remain in full force and effect as to all persons and entities and places mentioned therein except as hereby modified.
Attached hereto and made a part hereof is a drawing which shows the Clinic buffer zone referred to in this order.
DONE AND ORDERED in Sanford, Seminole County, Florida this 8th day of April, 1993.
 /s/ Robert B. McGregor
 Robert B. McGregor, Circuit Judge
*682 
NOTES
[1] The temporary injunction embraced the following restrictions:

1. All Respondents, the officers, directors, agents, representatives of Respondents, and all other persons, known and unknown, acting on behalf of any Respondents, or in concert with them, in any manner or by any means, are hereby enjoined and restrained from:
a) trespassing on, sitting on, blocking, or obstructing ingress into or egress from any facility in which abortions are performed or family planning services are provided in the County of Brevard and Seminole, and surrounding counties, State of Florida, of any person seeking access to or leaving those facilities;
b) physically abusing persons entering, leaving, working at or using any services at any facility in which abortions are performed or family planning services are provided, in the County of Brevard and Seminole, and surrounding counties, State of Florida;
c) attempting or directing others to take any of the actions described in paragraphs a) and b);
2. Nothing in this Court's Order should be construed to limit Respondents' exercise of their legitimate First Amendment rights, such as, but not limited to, carrying signs, singing, and praying, in a manner which does not violate a), b) and c) above....
[2] The parties' stipulation included the following:

2. Operation Rescue America, Ed Martin, Judy Madsen and Shirley Hobbs are active in an organization known as "Operation Rescue America." In other areas of the United States, this effort has been directed towards closing down abortion clinics throughout the country to save unborn children. Respondents desire is to close down "abortion mills" by various means. Operation Rescue America, Ed Martin, Judy Madsen and Shirley Hobbs well understand that peacefully blocking access to the facilities might constitute a trespass that is punishable by criminal penalties. They feel a violation of such a criminal statute is justified by their belief that protection of the unborn may merit breaking the criminal trespass laws.
....
6. Respondents have passed out flyers in the Central Florida area stating their desire to close down abortion clinics in this area. One of the flyers states that the demonstrations will be held in the Central Florida area.
7. Respondent Ed Martin has made statements that his desire is to close all abortion clinics in the Central Florida area. Ed Martin has stated to members of press that he would love to shut down all abortion clinics. Ed Martin has issued a press release which states that "the spirit of [massive anti-abortion demonstrations in] Wichita comes to Florida."
[3] The trial court made the following findings of fact:

2. Respondents are individuals and organizations, acting in concert, who have planned a nationwide campaign, which they call "OPERATION RESCUE" (hereinafter, "OPERATION"), directed towards closing down abortion clinics and providers throughout the country. Respondents' own literature states that their intention is to "Physically close down abortion mills" by encircling them with thousands of protesters and blocking access to the facilities. Operation Goliath is dedicated to similar principles.
....
5. Ed Martin and Pat Mahoney have stated an intent to prevent persons from obtaining abortions in the Brevard and Seminole County area by blocking access to clinics.
6. Respondents have passed out flyers in the Central Florida area stating an intent to close down abortion clinics in this area.
7. Respondent, Pat Mahoney, was a leader in the Wichita, Kansas protests. Respondents, Ed Martin and Pat Mahoney, have made statements that there will be or may be a blocking of the entrance to an abortion clinic in the Central Florida area. Pat Mahoney and Martin have stated to members of the press that they intend to shut down a clinic, and have issued a press release which states that "the spirit of Wichita comes to Florida." The press release also contained information that the Reverend Ed Martin of Ocala announces an "Operation Rescue" for Central Florida.
8. Literature obtained from Rescue America states that their members should ignore the law of the State and the police officers who remove them from their blockading positions.
[4] The permanent injunction contained the following general restrictions:

A. Respondents, OPERATION RESCUE ... are hereby enjoined from:
1. trespassing on, sitting in, blocking, impeding or obstructing ingress into or egress from any facility at which abortions are performed in Brevard and Seminole County, Florida;
2. physically abusing persons entering, leaving, working or using any services of any facility at which abortions are performed in Brevard and Seminole County, Florida; and,
3. attempting or directing others to take any of the actions described in Paragraphs 1 and 2 above.
B. Nothing in this Court's Order should be construed to limit Respondents' exercise of their legitimate First Amendment rights, such as, but not limited to, carrying signs, singing, and praying, in a manner which does not violate [paragraphs] 1, 2, and 3 above... .
[5] Although Operation Rescue notes in its brief that the right to free speech is also protected by the Florida Constitution, Operation Rescue makes no separate argument under the Florida charter.
[6] But see Frisby v. Schultz, 487 U.S. 474, 487, 108 S.Ct. 2495, 2503, 101 L.Ed.2d 420 (1988) ("But the actual size of the group is irrelevant; even a solitary picket can invade residential privacy.")
[7] We find the remainder of Operation Rescue's constitutional claims to be without merit.
[8] Operation Rescue's reliance on NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), to support its Free Speech claims is misplaced. There, the United States Supreme Court ruled that the First Amendment bars Mississippi courts from imposing damages liability in favor of white merchants against individuals and civil rights organizations for lost earnings stemming from a black boycott of white businesses during the 1960's. Although state courts had originally granted injunctive relief to the merchants, the injunction issue became moot when the boycott was voluntarily lifted and was not addressed at all by the federal Court. The propriety of the injunction in the present case, on the other hand, is the sole issue before this Court  no party even claims that the Health Center is entitled to damages for Operation Rescue's actions.
[9] See, e.g., Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (ordinance imposing blanket ban on targeted residential picketing constitutional where abortion opponents had demonstrated outside doctor's home); Northeast Women's Center, Inc. v. McMonagle, 939 F.2d 57 (3rd Cir.1991) (injunction containing language virtually identical to that in the present case held constitutional where read as creating 500 foot buffer zone around clinic and workers' homes); Medlin v. Palmer, 874 F.2d 1085 (5th Cir.1989) (ordinance banning use of bullhorns and loudspeakers within 150 feet of medical clinic upheld against challenge by abortion opponents); Portland Feminist Women's Health Center v. Advocates for Life, Inc., 859 F.2d 681 (9th Cir.1988) (injunction limiting picketing outside abortion clinic upheld when read as banning noise that "substantially interferes with the provision of medical services within the Clinic, including counseling"); Hirsh v. City of Atlanta, 261 Ga. 22, 401 S.E.2d 530 (injunction limiting demonstrations outside abortion clinic upheld), cert. denied, ___ U.S. ___, 112 S.Ct. 75, 116 L.Ed.2d 49 (1991); Planned Parenthood v. Operation Rescue, 406 Mass. 701, 550 N.E.2d 1361 (1990) (injunction limiting demonstrations outside abortion clinic upheld); Bering v. Share, 106 Wash.2d 212, 721 P.2d 918 (1986) (injunction limiting demonstrations outside abortion clinic upheld), cert. dismissed, 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987).
[10] We recognize that a panel of the United States Court of Appeals for the Eleventh Circuit has recently ruled that the federal district court erred in denying an abortion opponent's request for relief from the above injunction. See Cheffer v. McGregor, 6 F.3d 705 (11th Cir.1993).