867 So.2d 451 (2004)
ANIMAL RIGHTS FOUNDATION OF FLORIDA, INC., et al., Appellant,
v.
David SIEGEL and Westgate Resorts, Ltd., etc., Appellees.
No. 5D03-653.
District Court of Appeal of Florida, Fifth District.
February 6, 2004.
Rehearing Denied March 17, 2004.
*452 Thomas R. Julin & Patricia Acosta of Hunton & Williams, Miami, for Appellants.
Michael Marder, Victor Kline and Amanda Chapman of Greenspoon, Marder, Hirschfeld, Rafkin, Ross & Berger, P.A., Orlando, for Appellees.
PALMER, J.
The Animal Rights Foundation of Florida and Heather Lischin (collectively "the Foundation") appeal the non-final order entered by the trial court granting a temporary injunction to David Siegel and Westgate Resorts, Inc. We reverse.
David Siegel is president of Westgate Resorts, which is engaged in the business of timeshare development. The events precipitating the request for an injunction stem from Siegel's hiring of Tiger's Eye Productions to provide entertainment for Westgate Resorts through twice weekly animal shows as a draw for potential buyers. Tiger's Eye is an exotic animal performance company.
In August 2002, Siegel and Westgate filed a complaint against the Foundation alleging claims of tortious interference *453 with business relationships, invasion of privacy, slander, and libel. The Foundation is a non-profit organization founded on the principle that animals have the right to live their lives "free of exploitation, abuse, and harm inflicted upon them by society." Foundation members conduct demonstrations and letter writing campaigns, and use other media to promote animal rights. The complaint alleged that on or about April 4, 2002, Foundation supporters began to publish false statements about Siegel and Westgate concerning their continued association with Tiger's Eye. The Foundation allegedly picketed both at the front gate of Siegel's residential community and at his Westgate business offices, and circulated leaflets wherein the Foundation published various statements including claims that "David Siegel abuses animals" and that Westgate was "supporting animal abuse." The complaint sought both damages and injunctive relief.
Siegel and Westgate filed an emergency motion seeking a temporary injunction prohibiting the Foundation from publishing false and defamatory statements. After a hearing, the trial court denied the request for injunctive relief, finding that "a preliminary injunction which prohibits peaceful assembly and imposes prior restraints on speech is not sustainable under the first amendment and common law principles," and that "equity will not enjoin an actual or threatened defamation." The trial court also found that the cases cited in support of the injunctive relief involved "economic speech" and were therefore distinguishable from this case.
When protest activities continued, Westgate and Siegel filed a second emergency motion for a temporary injunction. This time, after receiving and considering additional evidence, the trial court granted the motion and entered a temporary injunction against the Foundation.
The Foundation challenges the injunction, raising two claims of error: (1) that Siegel and Westgate failed to meet the legal requirements for issuance of a temporary injunction, and, in the alternative, (2) that, even if a prima facie case for injunctive relief was made, the instant injunction operates as an improper prior restraint on its constitutional right of free speech granted by the state and federal constitutions.[1] We conclude that the evidence of record was insufficient to warrant the issuance of an injunction because said evidence failed to prove that Siegel and Westgate were entitled to receive a temporary injunction and because portions of the instant injunction violate the Foundation's first amendment rights.
The instant injunction operates to regulate both speech itself (that is, the Foundation's spoken and written word) and symbolic speech commonly referred to as "expression" or "verbal acts" (that is, the Foundation's picketing and demonstrating). In pertinent part, the injunction reads as follows:
INJUNCTION
* * *
B. That defendants Heather Lischin and the Animal Rights Foundation of *454 Florida, and their servants, employees, agents and any person or entity acting on their own behalf or at their request, and any person in active concert or participation with them (hereinafter "Defendants") are forthwith and immediately enjoined from tortiously interfering with Plaintiffs' advantageous business relationships by directly or indirectly publishing verbally, or in writing the following statements:
"David Siegel abuses animals"
"David Siegel condones animal abuse"
"Now featuring at Westgate Animal abuse"
"David Siegel supports animal abuse"
"Westgate supports animal abuse"
"Westgate supports cat beater"
"David Siegel supports cruelty to animals"
"Westgate supports cruelty to animals"
"Now featuring at Westgate animal abuse" and
"Westgate refuses to stop sponsoring animal cruelty," to:
(1) Plaintiffs' actual or prospective customers and their guests at the entrance to, or within any of Plaintiffs' timeshare in Florida. "Customers" shall mean all persons who have been invited by Plaintiffs, either directly or indirectly, to purchase or lease a timeshare unit at any of Westgate Resorts, Ltd's resorts. "Guests" shall mean all persons who have been invited by customers of Westgate Resorts, Ltd. "Invited" means those persons who have come to any of Westgate Resorts, Ltd's resorts as a result of any advertising, marketing or promotional activities by Westgate Resorts, Ltd.
(2) David Siegel's neighbors at the entrance to, or within, the subdivision wherein the Home is located.
C. That Defendants are enjoined from picketing at the gates of the subdivision wherein the Home is located or the entrance of Plaintiffs' timeshare resorts in Florida except that Defendants may have 5 agents or less appear on either side of the street from the gates of the subdivision wherein the Home is located and the other side of the road on which any of Plaintiffs' Florida timeshare resorts are located. The Foundation's agents shall be enjoined from videotaping any passers-by; from using megaphone or bull horn; from shouting at passers-by and from prohibiting the free flow of traffic in all the foregoing locations.
In Liberty Fin. Mortgage Corp. v. Clampitt, 667 So.2d 880 (Fla. 2d DCA 1996), the Second District set forth the applicable standard for the issuance of a temporary injunction as follows:
The general function of a temporary injunction is to preserve the status quo until full relief can be granted in a final hearing. Such an injunction is an extraordinary remedy. It should be granted only sparingly and only after the moving party has alleged and proved facts entitling it to relief.
(Citations omitted). Generally, in order to succeed on a motion for temporary injunction the moving party must prove that:
(1) the party has a clear legal right to the relief requested; that is, a substantial likelihood of success on the merits;
(2) irreparable harm will likely result if the trial court refuses to issue injunctive relief because an adequate remedy at law is not available; and,
(3) the public interest will be served by the imposition of an injunction.
Hall v. City of Orlando, 555 So.2d 963 (Fla. 5th DCA 1990); South Florida Limousines, Inc. v. Broward County Aviation Dep't., 512 So.2d 1059 (Fla. 4th DCA 1987). *455 In applying this analysis to the instant injunctive order, we will first discuss the injunction provisions relating to limitations on the Foundation's right to picket, and then address the prohibitions relating to the list of banned phrases.
We begin by recognizing that peaceful demonstrations in public places such as streets and sidewalks are protected by the first amendment yet subject to reasonable regulation. Grayned v. City of Rockford, 408 U.S. 104, 116, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The determination of whether a regulation is reasonable initially depends upon whether the regulation is content-neutral or viewpoint based.[2] Here, the restrictions placed upon the Foundation's right to picket generally relate to issues concerning the manner in which the picketing takes place, not to the content of the message delivered by the picketers; therefore, the regulations are content-neutral. As such, the picketing provisions of the injunction do not constitute traditional prior restraints which are subject to elevated constitutional scrutiny; however, general first amendment principles still apply. See Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 763 n. 2, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). To that end, when evaluating the constitutionality of a content-neutral injunction issued relating to picketing activity the court must determine "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." Madsen, 512 U.S. at 765, 114 S.Ct. 2516. In applying this analysis, our courts have found significant government interests to exist in instances where an injunction is entered to ensure the public safety and order, to promote the free flow of traffic on the public streets and sidewalks, and to protect the property rights of all citizens, concluding that such interests are "sufficient to justify an appropriately tailored injunction to protect them." Madsen, 512 U.S. at 768, 114 S.Ct. 2516.
Here, the trial court's injunction prohibits picketing which would impede the free flow of traffic. While such restrictions are generally allowed to support the significant public interest in promoting the free flow of traffic on the public streets and sidewalks while at the same time not burdening more speech than necessary, the entry of such injunctive relief in this case was improper in light of the fact that the record is devoid of any evidence that the Foundation had impeded or was likely to impede the free flow of traffic absent such injunctive relief. Compare Operation Rescue v. Women's Health Ctr., Inc., 626 So.2d 664 (Fla.1993) aff'd in part, rev'd in part sub. nom. Madsen v. Women's Health Ctr., 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (upholding injunctive relief prohibiting blocking access to abortion clinic where trial court made factual finding based on competent substantial evidence that enjoined party had engaged in impermissible activities now being enjoined).
Next, the instant injunction enjoins the Foundation's agents from using megaphones *456 or bull horns, and from shouting to passers-by. We conclude that these noise restrictions improperly burden more speech than is necessary to protect any valid public interest because they enjoin all shouting and all uses of bull horns or megaphones, rather than tailoring a prohibition against impermissible conduct, either engaged in or threatened by the Foundation's demonstrators. As such, the injunction is impermissibly broad. In so ruling, we rely upon the analysis regarding the regulation of amplified speech set forth in Daley v. City of Sarasota, 752 So.2d 124 (Fla. 2d DCA), rev. denied, 776 So.2d 275 (Fla.2000). In that case, the City had passed an ordinance prohibiting all amplified sounds emanating from incompletely enclosed structures in a commercial section of town. In invalidating that restriction, the court noted that the restriction was not limited to prohibiting "unreasonable" sound, but rather, prohibited all amplified sound during certain hours of the day, regardless of the volume of the sound and regardless of who could hear the sound. The Second District noted that, although the City could regulate unreasonable sound, that goal
could not be achieved by the overbroad regulation of activities protected by the First Amendment. As currently written, the City's ordinance could be used to suppress First Amendment rights far more severely than can be justified by the City's interest in regulating unreasonable sound.
752 So.2d at 126 (citation omitted). The court noted further that a blanket ban on all such amplified speech, regardless of its volume, would extend too far. See also Easy Way of Lee County, Inc., v. Lee County, 674 So.2d 863 (Fla. 2d DCA 1996)(holding that a noise ordinance prohibiting amplification of sounds which were "plainly audible" fifty feet away was deemed to be overly broad and vague and therefore unconstitutional). See generally State v. Globe Communications, Corp., 622 So.2d 1066, 1073 (Fla. 4th DCA 1993), aff'd, 648 So.2d 110 (Fla.1994)(explaining that prior restraints come in the form of both injunctions and legislation).
The instant injunction also states that the Foundation is permitted to picket at the gates of the Siegel's subdivision and the entrance of Westgate but that the number of picketers must total five agents or fewer, and the picketers must remain on the "other side of the road" from said properties. Again, we conclude that, on the basis of the instant record, these restrictions burden more speech than is necessary to protect any valid pubic interest in that no evidence was presented which indicated the need for the regulation of the number of protesters or the location of the demonstrations.
Lastly, the injunction completely prohibits the picketers from videotaping any passers-by. However, the record fails to suggest how such videotaping causes Westgate and Siegel (neither of whom are the subject of the videotaping) irreparable harm for which other remedies at law are inadequate and for which Siegel and Westgate have a clear legal right to receive relief. Compare Goosen v. Walker, 714 So.2d 1149 (Fla. 4th DCA 1998)(allowing the enjoining of videotaping by the person being videotaped upon an evidentiary showing that the conduct rose to the level of stalking); Wolfson v. Lewis, 924 F.Supp. 1413 (E.D.Pa.1996) (allowing injunctive relief in the form of a prohibition on videotaping on behalf of the person being videotaped where the conduct was a persistent course of hounding, harassment, and unreasonable surveillance which rose to the level of invasion of privacy based on intrusion upon seclusion).
*457 In summary, we conclude that all of the injunction provisions relating to limitations on the Foundation's right to picket must be struck down as being improper.
Moving on to the injunction's regulation of the picketers' speech, the trial court prohibited the Foundation members from directly or indirectly publishing, verbally or in writing, the following statements:
David Siegel abuses animals
David Siegel condones animal abuse
Now featuring at Westgate-Animal abuse
David Siegel supports animal abuse
Westgate supports animal abuse
Westgate supports cat beater
David Siegel supports cruelty to animals
Westgate supports cruelty to animals
Now featuring at Westgate animal abuse, and
Westgate refuses to stop sponsoring animal cruelty
Unlike the picketing restrictions, these restrictions are clearly content-based regulations which operate as prior restraints on the Foundation's constitutional right to freedom of expression. As such, the restrictions are presumptively invalid and must overcome strict scrutiny. See Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).[3] "Under `strict' scrutiny, which applies inter alia to certain classifications and fundamental rights, a court must review the [regulation] to ensure that it furthers a compelling state interest through the least intrusive means." North Florida Women's Health & Counseling Services, Inc. v. State, 866 So.2d 612 n. 16 (Fla. 2003).
Here, there is no "compelling state interest" which is met by the instant injunction terms, which merely regulate the private rights of the parties. Accordingly, these provisions of the trial court's injunction are in violation of the Foundation's first amendment rights. See Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971)(holding that designation of conduct of community organization in distributing leaflets critical of real estate broker's alleged "block busting" and "panic peddling" activities in area of Chicago as an invasion of broker's rights of privacy was not sufficient to support an injunction against peaceful distribution of informational literature, and claim that literature was intended to exercise a coercive impact on broker did not remove literature from the reach of the first amendment).
In closing, we note that the arguments of Siegel and Westgate that the injunction is proper because the Foundation's activities constitute tortious interference are misplaced. Our analysis of this argument must begin with a determination of whether the prohibited speech is pure or commercial speech. In Strang v. Satz, 884 F.Supp. 504, 507 (S.D.Fla.1995), the district court aptly explained the difference between the two types of speech as follows:
Pure speech is that in which society has an interest wholly apart from the speaker's or listener's economic interest. Abramson v. Gonzalez, 949 F.2d 1567, 1574 (11th Cir.1992). In contrast, commercial speech is that which proposes a commercial transaction. Virginia State Bd. of Pharmacy v. Virginia Citizens *458 Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). In comparison to pure speech, the Supreme Court affords commercial speech "a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression." Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978).
The evidence in the record established that the Foundation was not a competitor of Siegel or Westgate, nor was the Foundation's activity promoting some economic interest. Rather, the speech was of a political nature, protesting alleged animal rights violations. As such, the speech involved in this case was pure speech which was not properly restrained to prevent the tortious interference alleged.[4]See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982)(enjoining non-violent political protests in order to prevent a tortious interference with business violates the first amendment).
REVERSED and REMANDED.
ORFINGER, J., concurs.
SAWAYA, C.J., concurs in part and dissents in part, with opinion.
SAWAYA, C.J., concurring in part, dissenting in part.
I concur in part and respectfully dissent in part. Because they are critical to the resolution of the issues in this appeal, I will discuss the facts and the evidence in detail, thereby revealing why affirmance of the temporary injunction, at least in substantial part, is appropriate. After discussing the factual background of the instant case, I will discuss, in the following order, the standard of review, the part of the injunction regulating picketing and the prohibited speech.

Factual Background
The protests and demonstrations against Siegel and Westgate stem from a videotape obtained approximately eight years ago by an organization known as People for the Ethical Treatment of Animals (PETA). It must be emphasized at the outset that this eight-year-old tape has absolutely nothing to do with Siegel or Westgate. To obtain the tape, PETA sent one of its members to covertly film animal training techniques utilized by Tiger's Eye Production (TEP), an exotic animal performance company. This effort produced approximately four minutes of footage depicting harsh discipline methods that were part of the training regimen of the tigers. PETA apparently presented this tape for agency review to support PETA's allegations of animal abuse. It is noteworthy that this tape, which is all of the so-called evidence that Lischin and the Foundation have presented concerning animal abuse, was provided to the appropriate state attorney's office for prosecution of animal abuse charges instigated by the Foundation, but the state attorney's office declined to prosecute because of insufficient evidence of animal abuse.[1] The tape was *459 also presented to the United States Department of Agriculture (USDA), which made the following finding regarding the tape and the allegations of animal abuse:
The Animal Care VMO inspection did not find violations, and the Regulatory Enforcement investigator did not find corroborative evidence that might further substantiate PETA's allegations.
The videotape may be the best evidence to weigh the charges of physical abuse as stated in 9 CFR 2.131(2)(I)[.] ... After discussing the video contents with Dr. Cook, we found no substantial evidence of physical treatment inconsistent with accepted training methods for the exotic cat breeds.
After discussion with Animal Care veterinarians, it has been determined that the alleged violations have not been proven and prosecution is doubtful. The case has been closed.
Apparently PETA also sent a copy of the tape and the government's findings to the Foundation. Thus, when Siegel and Westgate hired TEP so that Siegel's timeshare customers could see exotic animals while at Westgate, Siegel and Westgate became the target of the Foundation's protests and demonstrations. The trial judge set out the facts of the case in detail in the injunction regarding those protests and demonstrations as follows:
10. From or about April 4, 2002 the FOUNDATION has picketed and demonstrated at least seven times at Westgate Resorts against WESTGATE's use of Tiger's Eye Production. (T. 75).
11. From or about May 23, 2002 the FOUNDATION has picketed and demonstrated at least five times at the gates of Islesworth which is the Orange County, Florida subdivision in which SIEGEL and his family reside. (T. 76).
12. On each of the foregoing occasions the FOUNDATION directed as many as 4 to 15 of its agents to picket and demonstrate at WESTGATE and SIEGEL's home with megaphones through which those agents verbally published statements, including "David Siegel abuses animals" (T. 29, 50); "David Siegel condones animal abuse" (T. 29); and "WESTGATE condones animal abuse" (T. 29); and "Now Featuring at Westgate-Animal Abuse" (T. 30) (the "Verbal Statements").
13. Further, the FOUNDATION's agents carried signs during their protest outside the guard gate of Islesworth and at WESTGATE which said: "David Siegel supports animal abuse;" "WESTGATE supports animal abuse;" and "WESTGATE supports cat beater." (T. 65, 66).
14. On or about July, 2002 LISCHIN sent a letter to residents of the subdivision in which SIEGEL resides (the "Letter") (T. 31). A true and correct copy of the Letter was attached to the verified Complaint as Exhibit "B."
15. The letter was sent by LISCHIN and received by SIEGEL and his neighbors. (T. 31).
16. The Letter contained statements that: SIEGEL, as the president of WESTGATE, was "supporting animal abuse" (T. 31); and that SIEGEL "has for several years known about the exploitative nature of Tiger's Eye, and yet has refused to acknowledge the appalling abuse of big cats, including lions, tigers and leopards." (T. 31). The Letter and the Signs are collectively referred to as the "Written Statements."
*460 17. The Letter referenced a website which the reader could access in order to view a videotape which allegedly showed Tiger's Eye Production ("TEP") abusing animals (the "Videotape").
18. This Court reviewed the eight year old videotape. Assuming that the videotape depicted TEP employees and agents, this Court has seen little evidence of TEP's alleged animal abuse. More importantly Defendants' admit that they have no evidence of any subsequent animal abuse by TEP since this Videotape. (T. 103).
19. Further, Defendants' Exhibit 1 confirmed that the USDA had decided not to prosecute TEP for any violation [or] violations of the Animal Welfare Act. (T. 50, 56, 84) (Def: Ex:1).
20. Even if the eight year old videotape had caused the USDA to prosecute TEP for violations [of] the Animal Welfare Act, SIEGEL avers that he never saw the videotape until the day before the hearing on the Motion. (T. 34).
21. SIEGEL testified that he has never seen any evidence that TEP abuses animals. (T. 42, 43, 44). SIEGEL knows of no violations by TEP of the Animal Welfare Act. (T. 50).
22. Neither SIEGEL, nor WESTGATE have any financial interest in TEP as an owner, shareholder, officer or director. (T. 51).
23. SIEGEL has business relationships with some of his neighbors who received the Letter. (T. 45).
24. SIEGEL has business relationships with all of his customers and guests at WESTGATE's resorts. (T. 83). The FOUNDATION has picketed and demonstrated at WESTGATE knowing that WESTGATE's guests and customers are there. (T. 83).
25. The FOUNDATION's counsel admitted that the FOUNDATION was attempting to interfere with Plaintiffs' relationship with TEP. (T. 49).
26. The Verbal and Written Statements [are] likely to be found to be false and defamatory. The sole basis for ARFF's allegations of abuse is an eight year old, three minute videotape. The actions depicted on the video constitute harsh discipline and training techniques, but have resulted in no prosecution and no apparent injury to the animals. While it is clear that the Defendants believe that the techniques are abusive, they have no evidence that any such alleged abuse has occurred in the last eight years. Even if TEP did once engage in animal abuse, there is no evidence that SIEGEL knew about it. Moreover, even if SIEGEL had known about TEP's alleged animal abuse, it is likely to be found to be defamatory to publish all of the Written and Verbal Statements about SIEGEL and WESTGATE, because they did not "abuse animals", "condone animal abuse", or "support animal abuse."
. . . .
B. The following Statements, to wit: "David Siegel abuses animals", "David Siegel condones animal abuse", "Now featuring at Westgate Animal Abuse", "David Siegel supports animal abuse", "Westgate supports animal abuse", and "Westgate supports cat beater", are hereinafter referred to as the Pre Litigation Statements.
C. Defendant, ARFF, has updated its website to include the article attached.... The following salient statements are made in the article:
1. "Westgate Resorts supports animal abuse." This was the exact same language which this Court found to likely be defamatory. (Order ¶ 1, 13 and 26).
*461 2. "CRUELTY ENDORSED BY WESTGATE RESORT" "... David Siegel and Westgate Resorts were sent incontrovertible video evidence of Tiger's Eye Productions' heinous abuse ... Mr. Siegel has seen video of Tiger's Eye Productions owner David McMillan ... hit tigers and lions in the face with axe handles, PVC pipes, and wooden sticks.... He has seen them refuse to feed traumatized animals until they performed. And despite this Siegel has turned a blind eye to Tiger's Eye." This statement is squarely contradicted by this Court's prior findings that the Court "has seen little evidence of TEP's alleged animal abuse. More importantly Defendants' admit that they have no evidence of any subsequent animal abuse by TEP since this videotape." (Order ¶ 18); and "USDA had decided not to prosecute TEP for any violation of the Animal Welfare Act" (Order ¶ 19); and "Siegel knows of no violations by TEP of the Animal Welfare Act" (Order ¶ 21); and "while it is clear that the Defendants believe that the techniques are abusive, they have no evidence that any such alleged abuse has occurred in the last eight years.... (Order ¶ 26).
3. The FOUNDATION's demonstrations have "replac[ed] Westgate customer's views of the resort with disturbing images of tiger beatings and torture. Customers of Westgate will have trouble focusing on timeshare investments after learning just what these animals are forced to endure to get them to perform. We intend to be there on a regular basis to make sure Westgate and their customers don't forget the pain and torture behind McMillan's show. ARFF will be a constant thorn in the side of Westgate...."
4. "ARFF will continue not only encouraging Siegel to take action but his neighbors as well...."
5. "Westgate ... have thus far refused to stop sponsoring animal cruelty...." This was almost the exact language which this Court found to likely be defamatory (Order, ¶ 1, 13 and 26).
D. On February 12, 2003 10-15 people from the FOUNDATION picketed at the gates of the subdivision wherein David Siegel lives (the "Home"). During the picketing the FOUNDATION's agents published statements on signs that "David Siegel supports cruelty to animals at Westgate." This was almost the same exact language which this Court found to likely be defamatory. (Order ¶ 1, 13 and 26). The FOUNDATION published statements in written hand outs including "Now Featuring: Animal Cruelty at Westgate Resorts;" and "Westgate refuses to stop sponsoring animal cruelty." This was almost the exact language which the Court found likely to be defamatory (Order ¶ 1, 13 and 26). The Statements in C and D of this Temporary Injunction are collectively referred to as the Post Litigation Statements. The FOUNDATION used a ten foot sign to convey the Post Litigation Statements; the FOUNDATION videotaped people driving into the subdivision wherein the Home was located; the FOUNDATION stopped traffic to speak with people driving into and out of the subdivision wherein the Home was located; the FOUNDATION's agents shouted at passers by their [sic] during picketing. Police *462 were required to be present during the picketing.
E. At the hearing on the Motion the FOUNDATION admitted that it was its express intention that the Pre Litigation Statements and the Post Litigation Statements (collectively the "Statements") directly interfere with Plaintiffs' contracts and advantageous business relationships in order to economically destroy Plaintiffs. The FOUNDATION also admitted that it would continue to publish the Statements at both the Home and at Westgate Resorts, Ltd's Florida resorts (the "Business").
F. The Post Litigation and Pre Litigation Statements are false and defamatory.
G. Plaintiffs will suffer irreparable harm if Defendants, and their agents and employees are not enjoined from tortiously interfering with Plaintiffs' advantageous business relationships, from demonstrating, picketing, and publishing the Post Litigation and Pre Litigation Statements (collectively the "Statements") orally or in writing.
H. Plaintiffs have no adequate remedy at law where damages will not redress the harm Plaintiffs will suffer if Defendants continue demonstrating picketing and tortiously interfere with Plaintiffs' advantageous business relationships and Defendants continue to publish the Statements.
I. Plaintiffs have a substantial likelihood of success on the merits of their Complaint.
J. A temporary injunction will serve the public interest by restraining further demonstrating, picketing, defamatory statements and letters and by protecting existing advantageous business relationships.
Having outlined the factual background, I will next determine the appropriate standard of review to be applied to determine whether the injunction, or portions of it, improperly infringes on the Foundation's and Lischin's right to free speech as the majority contends.

The Standard of Review
In reviewing an order granting a temporary injunction, the supreme court in Smith v. Coalition to Reduce Class Size, 827 So.2d 959 (Fla.2002), explained the standard of review.
We begin our analysis by addressing the appropriate standard of review. In Operation Rescue v. Women's Health Center, 626 So.2d 664 (Fla.1993), this Court stated the following regarding an appellate court's standard of review of a trial court's grant of an injunction:
Where an injunction is issued and challenged, Florida's appellate courts possess express authority to review the order. Fla. R.App. P. 9.130(a)(3)(B). The scope of review, however, is limited. As a general rule, trial court orders are clothed with a presumption of correctness and will remain undisturbed unless the petitioning party can show reversible error. To the extent it rests on factual matters, an order imposing a permanent injunction lies within the sound discretion of the trial court and will be affirmed absent a showing of abuse of discretion. This is particularly true where the order relies on live testimony or other evidence that the trial court is singularly well-suited to evaluate. Abuse of discretion, of course, is judged by the general "reasonableness" standard:
In reviewing a true discretionary act, the appellate court must fully recognize the superior vantage point of the trial judge and should *463 apply the "reasonableness" test to determine whether the trial judge abused his discretion. If reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion. The discretionary ruling of the trial judge should be disturbed only when his decision fails to satisfy this test of reasonableness.
Id. at 961 (quoting Operation Rescue v. Women's Health Ctr., 626 So.2d 664, 670 (Fla.1993) (quoting Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980))).[2] The court also held that purely legal matters should be reviewed de novo. If part of a temporary injunction is improper and the remaining portions of the injunction are proper, the appellate court may affirm the injunction and strike the improper provisions. See Coscia v. Old Florida Plantation, Ltd., 828 So.2d 488 (Fla. 2d DCA 2002).
Having discussed the standard of review, I will next address the portion of the injunction regulating picketing.

Picketing the Residence and the Business
I agree with the majority that the restrictions placed on the Foundation and Lischin regarding picketing are content-neutral, but I disagree with the majority that the restrictions were implemented solely to prevent impediments to the free flow of traffic. Here is what the trial court found as the basis for entering the temporary injunction:
That's exactly what's going on in this circumstance, you are asserting the right of free speech in order to intentionally destroy a man and his business. That's a tortious harm. So I am going to issue an injunction to try to stop that. I want to narrowly tailor the injunction, and I agree with you that banning speech outright in all forms, newspapers, that sort of thing, is inappropriate. So what I'm trying to eliminate here is the coercive business-destroying conduct and speech that your clients are engaging in, which is primarily the approaching of the customers, overwhelming them with your allegations as to allowing him to do business at West Gate, harassing the people in the outskirts of a residence where the man lives. This is harassment and it's coercion and it's more than speech and it's done with a tortious intent. So that's what I'm trying to enjoin.... So really what I'm trying to do is enjoin the tortious interference that involves the picketing and harassment and not the messages they're trying to convey by other means.
The findings of fact made by the trial judge in the preliminary injunction reveal that the Foundation and Lischin would videotape people driving into the entrance of the subdivision where Siegel resides and *464 would stop traffic as it tried to enter and exit the Westgate Resort and shout at passers by. The trial court also found that the "police were required to be present during the picketing." As the trial court stated, the restrictions on picketing were implemented to stop the "harassment" of the visitors, residents and those passing by on the street adjacent thereto. The trial judge also based his finding of harassment on the following excerpt from the Foundation's website. This excerpt, introduced into evidence, is very telling about what the Foundation wanted to accomplish through its picketing:
ARFF has been conducting demonstrations at the Westgate Resorts replacing Westgate customer's views of the resort with disturbing images of tiger beatings and torture. Customers of Westgate will have trouble focusing on timeshare investments after learning just what these animals are forced to endure to get them to perform. We intend to be there on a regular basis to make sure Westgate and their customers don't forget the pain and torture behind McMillan's show, ARFF will be a constant thorn in the side of Westgate until the resort agrees animal cruelty is not an appropriate sales pitch and puts an end to all Tiger's Eye Productions performance.
Harassment is not speech: it is wrongful conduct. The Florida Supreme Court has recognized that "[t]he government has a strong and legitimate interest in preventing the harassment of individuals.... `Prohibiting harassment is not prohibiting speech, because harassment is not a protected speech. Harassment is not communication, although it may take the form of speech.'" Gilbreath v. State, 650 So.2d 10, 12 (Fla.1995) (quoting Thorne v. Bailey, 846 F.2d 241, 243 (4th Cir.1988) (quoting State v. Thorne, 175 W.Va. 452, 333 S.E.2d 817, 819 (1985))); see also Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949) (upholding an injunction prohibiting picketing by a labor union; holding that wrongful conduct brought about by speech may be prohibited without violating the right to free speech). Because harassment is improper conduct, it may be prohibited, or at least regulated, through an injunction. See Kimball v. Florida Dep't. of Health & Rehabilitative Servs., 682 So.2d 637 (Fla. 2d DCA 1996) (holding that persons subject to harassment may obtain injunctive relief).
The majority bases its decision to reverse the picketing regulations in the temporary injunction on the right of free speech. As I have explained, harassment is not considered speech. But even if there were not a finding of harassment in the instant case, the regulation of the picketing would nevertheless be appropriate based on free speech standards. The right to free speech, as fundamental and precious as it is to an ordered and free society, does not form an impenetrable shield that allows any and all manner of expression no matter how dangerous, perilous or injurious to others.
In Johnson v. Women's Health Center, Inc., 714 So.2d 580 (Fla. 5th DCA), review denied, 719 So.2d 893 (Fla.1998), this court reviewed a modified amended injunction that had been entered in a case after remand from the United States Supreme Court. See Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). This case originally involved an injunction restricting the protests of the appellants, who opposed abortion. The appellants had been conducting protest activities at the Aware Woman Clinic, the home of a clinic nurse and a motel at which a clinic physician had stayed. In reviewing the amended injunction *465 entered against the appellants, the United States Supreme Court in Madsen held that injunctive relief was appropriate but struck down certain portions of the injunction on free speech grounds. The case was eventually remanded to the circuit court, which entered, in accordance with the Madsen decision, the modified amended injunction, which was then appealed to this court. This court upheld the amended modified injunction, stating:
On remand, the circuit court amended the provision to allow for generalized picketing, but with limitations on the times that picketing could be conducted, the duration of the picketing, and the number of picketers. In addition, the modified amended injunction required the appellants, when they desired to demonstrate within 300 feet of a staff residence, to remain on the side of the street away from the residence. We find no error in this provision. See Douglas v. Brownell, 88 F.3d 1511 (8th Cir.1996) (upholding ordinance barring picketing in front of targeted residence and two adjacent residences, but allowing picketing on sidewalk across street).
Johnson, 714 So.2d at 583. The injunction entered in the instant case similarly limits the number of picketers. Moreover, the location restriction in the instant case is analogous to that in Johnson, i.e., they may picket across the street from the entrances to Isleworth and Westgate. In accordance with this court's decision in Johnson, the portion of the injunction relating to picketing should be upheld.
The rationale of this court in Johnson, which discusses several acceptable limitations on the right to free speech, is certainly applicable in the instant case. In reviewing the modified amended injunction, this court quoted from the Madsen decision where the Court observed that the significant government interests that were protected by the temporary injunction in that case included "`ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks,... protecting the property rights of all its citizens'" and "`the State's strong interest in residential privacy, acknowledged in Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988)....'" Johnson, 714 So.2d at 581 (quoting Madsen, 512 U.S. at 768, 114 S.Ct. 2516) (citing Operation Rescue, 626 So.2d at 672).
The Florida Supreme Court in Operation Rescue and the United States Supreme Court in Madsen have acknowledged, as should we, that "[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." Carey v. Brown, 447 U.S. 455, 471, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980). The sanctity of the home was emphasized in Frisby, where the United States Supreme Court held:
One important aspect of residential privacy is protection of the unwilling listener. Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different.... [A] special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.
487 U.S. at 484-85, 108 S.Ct. 2495 (citations omitted). In my view, the trial court carefully crafted the part of the injunction regulating picketing so that it does not burden the Foundation's right to free speech any more than necessary to prohibit the improper conduct and protect the *466 privacy rights of the residents of both the subdivision and Westgate.
The trial court also based its decision to regulate picketing on the Foundation's admitted purpose of interfering with the business relationship Siegel had with TEP. The courts have held that injunctive relief is appropriate to accomplish this purpose as long as it is narrowly tailored to prevent undue infringement on the picketers' right to free speech. See Zimmerman v. D.C.A. at Welleby, Inc., 505 So.2d 1371 (Fla. 4th DCA 1987).
I believe that the portion of the injunction directed to the picketing, with the exception of the use of the megaphone, should be affirmed. Regarding the use of video cameras, I believe that in order to prevent harassment of those who attempt to enter and exit the subdivision and Westgate, the picketers should be prohibited from using video cameras to tape them. See Goosen v. Walker, 714 So.2d 1149, 1150 (Fla. 4th DCA 1998) (upholding an injunction preventing videotaping of neighbors and rejecting the notion that the injunction prohibited a form of free speech; stating that "`[c]onduct that amounts to a persistent course of hounding, harassment and unreasonable surveillance, even if conducted in a public or semi-public place, may nevertheless rise to the level of invasion of privacy based on intrusion upon seclusion.'") (quoting Wolfson v. Lewis, 924 F.Supp. 1413, 1420 (E.D.Pa.1996)).
I will next determine whether the proscribed statements listed in the injunction violate the Foundation's and Lischin's right to free speech.

Regulation of the Content of the Speech
The preliminary injunction provides that the Foundation and Lischin are prohibited from making a number of statements, including "David Siegel abuses animals" and "David Siegel condones animal abuse." The majority opinion provides that the injunction prohibiting the Foundation and Lischin from proclaiming any of the statements listed in the order granting the injunction, including the two just mentioned, is a violation of the Foundation's and Lischin's right to free speech.
I will first address the two statements to which I have just referred because what I find very interesting is the testimony of the Foundation that it does not and should not make those statements. The testimony of Brian Wilson, a coordinator for the Foundation and the only witness to testify on behalf of the Foundation, is revealing because he steadfastly denied that he or anyone on behalf of the Foundation stated that Siegel or Westgate abused or condoned animal abuse. For example, he testified, "We don't ever say that Westgate Resorts or David Siegel is the one who is doing the animal abuse."[3] The reason *467 that the Foundation denies making these statements is because there is absolutely no evidence on this record to indicate that they are even remotely true. In fact, the Foundation and Lischin go out of their way in their Initial Brief to point out that they did not send a message that Siegel or Westgate abuse animals or that they condone animal abuse. In essence, the majority opinion holds that the injunction prohibiting the Foundation and Lischin from making the two statements is a violation of their right to free speech when they adamantly deny ever having made the statements and clearly indicate that, indeed, they should not make them. Because the injunction prohibits two statements that the Foundation and Lischin admit are wrong for them to make, that part of the injunction should be affirmed.
The majority opinion holds that enjoining all of the statements listed in the injunction violates the Foundation's and Lischin's right to free speech. Florida's constitution provides that "[e]very person may speak, write and publish sentiments on all subjects but shall be responsible for the abuse of that right." Art. I, § 4, Fla. Const. The trial court found that the Foundation and Lischin abused that right because the prohibited statements are false and defamatory and tortiously interfere with Siegel's business relationship with TEP.
Regarding the defamatory nature of the prohibited speech, the United States Supreme Court has recognized that:
[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or `fighting' wordsthose which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.
Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (footnotes omitted).
The federal jurisprudence regarding defamation, which is a basis for the injunction in the instant case, has developed further since Chaplinsky and has placed some limits on state law regarding defamation. Those limits generally depend on whether the target of the defamation is a private or public figure and whether the uttered statement is a matter of public concern. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); see also Barnes v. Horan, 841 So.2d 472 (Fla. 3d DCA 2002). The burden of proof that a public figure must meet in establishing a cause of action for defamation is more stringent than the burden imposed on a private individual. Milkovich; Hepps; Barnes.
Perhaps the distinction recognized by the courts between public and private figures is the reason the Foundation and Lischin spent so much time and effort in their brief trying to convince this court that Siegel is a public figure subject to a different and more stringent burden of proof in the underlying action. Nevertheless, the trial court made no such finding, even though it did find that all of the statements that it included in the preliminary *468 injunction are false. The law of this state, however, still adheres to the general principle that a defamation may not be enjoined,[4] so I will concede that the statements should not be prohibited by the injunction because they are defamatory. If the law were otherwise, however, I would vote to affirm the temporary injunction in its entirety with the exception of the megaphone.
I will next address the commercial nature of the speech and its use to tortiously interfere with the business relationship Siegel has with TEP. "`[C]ommercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values,' and is subject to `modes of regulation that might be impermissible in the realm of noncommercial expression.'" Board of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 477, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (quoting Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978)). The United States Supreme Court has explained the test applicable to restrictions on commercial speech:
[W]e engage in "intermediate" scrutiny of restrictions on commercial speech, analyzing them under the framework set forth in Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Under Central Hudson, the government may freely regulate commercial speech that concerns unlawful activity or is misleading. Commercial speech that falls into neither of those categories ... may be regulated if the government satisfies a test consisting of three related prongs: First, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction on commercial speech directly and materially advances that interest; and third, the regulation must be "`narrowly drawn.'"
Florida Bar v. Went For It, Inc., 515 U.S. 618, 623-24, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (citations omitted); see also Abramson v. Gonzalez, 949 F.2d 1567, 1575 (11th Cir.1992).
The majority contends that the speech at issue in the instant case is pure speech, which is political in nature. The majority, quoting Strang v. Satz, 884 F.Supp. 504, 507 (S.D.Fla.1995) (citations omitted), defines "pure speech" as "that in which society has an interest wholly apart from the speaker's or listener's economic interest" and defines "commercial speech" as "that which proposes a commercial transaction." I do not agree that the speech utilized by the Foundation and Lischin is pure speech of a political nature because it is personal and directed at Siegel and Westgate by wrongfully accusing them of engaging in, condoning, and supporting animal abuse with the purpose of tortiously interfering with the business relationship that Siegel has with TEP.
With regard to the two statements previously discussed, i.e., that Siegel abuses animals and condones animal abuse, I can see no other reason they would be made other than to tortiously interfere with Siegel's business relationship with TEP. They are false and totally misleading commercial statements that may be prohibited by injunctive relief. I do not believe that these two statements have any political value at all. Therefore, aside from the Foundation's and Lischin's admission that *469 it should not, and does not make such statements, I believe they should be enjoined from making them in the future because they constitute misleading commercial speech.
As to the other statements, I am conflicted because the statements could conceivably be made on the premise that because Siegel has hired TEP, which the Foundation believes engages in animal abuse, Siegel indirectly supports animal abuse. While it is clear to me that the remaining statements are not pure speech, I am likewise not convinced that they are totally "commercial" in nature as that term is currently defined in the pertinent case law. These statements appear to me to be a combination of both, but mostly commercial. Hence, for whatever political value they may have and to ensure that the injunction is narrowly drawn to protect the Foundation's and Lischin's right to free speech, I agree with the majority that the remaining statements listed in the injunction should not be prohibited.
With regard to preventing the Foundation and Lischin from tortiously interfering with Siegel's business relationship with TEP, it is my view that the injunction is appropriate for that purpose as long as it is narrowly drawn so as not to unnecessarily infringe on their right to free speech. See Zimmerman; see also Florida Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam County, 616 So.2d 562, 564 n. 1 (Fla. 5th DCA 1993) (noting in a case involving tortious interference with a business relationship that "[i]n the event the trial court determines that injunctive relief may lie in this case, the trial court should fashion such injunctive relief as to not prohibit as a prior restraint any activities which fall within the ambit of the first amendment") (citing Zimmerman). Therefore, the injunction should be affirmed after the portions prohibiting use of the megaphone and the statements regarding support for animal abuse have been stricken.

Conclusion
It is my view, based on the record in the instant case as developed so far, that restricting the Foundation and Lischin to picketing and protesting across the street from Westgate and the subdivision and prohibiting the speech that they deny making and indicate that they should not make, sufficiently grants the necessary relief to Siegel and Westgate while doing no more than necessary to restrict the Foundation's and Lischin's constitutional right to speak. If any further evidence is presented or if circumstances change, the parties may address them at the appropriate time by filing motions to dissolve or amend the injunction.
NOTES
[1] The First Amendment of the United States Constitution provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition to the Government for a redress of grievances.
U.S. Const. Amend. I. Article I, section 4 of Florida Constitution provides:
Every person may speak, write and publish his sentiments on all subjects but shall be responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press.
Art. 1, § 4, Fla. Const.
[2] "A regulation of speech which distinguishes favored speech from disfavored speech on the basis of ideas or viewpoints is generally contentbased, while a regulation which imposes a burden on speech without reference to the ideas or viewpoints expressed in the speech is, in a majority of instances, contentneutral." Café Erotica v. Florida Dep't. of Transp., 830 So.2d 181 (Fla. 1st DCA 2002), rev. denied, 845 So.2d 888 (Fla.2003); see also Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 763, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994)(explaining that the principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech without reference to the content of the regulated speech).
[3] "The clearest definition of prior restraint is an administrative system or a judicial order that prevents speech from occurring." Erwin Chemerinsky, Constitutional Law: Principles and Policies 770 (1997).
[4] The trial court appears to have properly recognized this fact is its first order denying the request for injunctive relief, since it found cases involving economic speech to be distinguishable.
[1] The record contains a letter from the State Attorney's office in Brevard County to PETA dated August 5, 1996, stating that "we will not presently be able to sustain a prosecution for animal abuse under section 828.12, Florida Statutes, in this case." The record also contains a letter from Governor Chiles dated October 2, 1996, indicating that the matter was reviewed by the Game and Fresh Water Fish Commission, which found no violations.
[2] See also Yardley v. Albu, 826 So.2d 467 (Fla. 5th DCA 2002); Rollins, Inc. v. Parker, 755 So.2d 839, 841 (Fla. 5th DCA 2000) ("A trial court's ruling on whether to enter a temporary injunction is subject to abuse of discretion review.") (citation omitted); Gold Coast Chem. Corp. v. Goldberg, 668 So.2d 326, 327 (Fla. 4th DCA 1996) ("A trial court's ruling on a temporary injunction comes to the appellate court with a presumption of correctness, reversible only upon a showing of a clear abuse of discretion.... These are some of the reasons that a party appealing the denial of a temporary injunction has the heavy burden of demonstrating that the trial court's ruling was clearly improper.") (citations omitted); Richard v. Behavioral Healthcare Options, Inc., 647 So.2d 976, 978 (Fla. 2d DCA 1994) ("The trial court has wide discretion to grant or deny a temporary injunction, and the appellate court will not intercede unless the grieving party clearly shows an abuse of discretion.") (citation omitted).
[3] The following is a portion of the testimony of Brian Wilson:

Q. I think you mentioned some signs and flyers and so forth. Do any of the written materials that have been used by ARE [the Foundation] in connection with these demonstrations say that David Siegel abuses animals?
A. No.
Q. Did any of them say that Westgate abuses animals?
A. No.
Q. Do any of the protestorswell, I'll start with you first. Have you said in any of these demonstrations that David Siegel abused animals?
A. No.
Q. Have you said that Westgate abuses animals?
A. No.
Q. To your knowledge, have any of the other protestors said that Mr. Siegel or his company abused animals?
A. No
Q. Is that something that ARE has instructed its people to say?
A. No.
[4] See Demby v. English, 667 So.2d 350, 355 (Fla. 1st DCA 1995); Rodriguez v. Ram Sys., Inc., 466 So.2d 412 (Fla. 3d DCA 1985).